AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Northern District of New York

**FILED**

Feb 26 - 2025

John M. Domurad, Clerk

U.S. DISTRICT COURT - N.D. OF N.Y.

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| A GREEN IPHONE IN A BLACK CASE SEIZED FROM DEVERE "BLACK" WILLIAMS AND CURRENTLY LOCATED AT 200 MCCARTY AVENUE, ALBANY | ) ) ) ) |

Case No. 1:25-sw- 41  (PJE)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Northern_____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1); 18 U.S.C. § 924(c)(1)(A); 18 U.S.C. § 922(a)(1) | Distributing and possessing with intent to distribute controlled substances; possession of a firearm in furtherance of a drug trafficking offense; possession of a firearm by a prohibited person |

The application is based on these facts:

See accompanying affidavit, incorporated herein

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Patrick M. Lydon
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: ____02/26/2025____

_____
*Judge's signature*

City and state:  Albany, New York

Hon. Paul J. Evangelista
_____
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A GREEN IPHONE IN A BLACK CASE SEIZED FROM DEVERE "BLACK" WILLIAMS AND CURRENTLY LOCATED AT 200 MCCARTY AVENUE, ALBANY | Case No. 1:25-sw-41 (PJE) |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Patrick M. Lydon, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure (FRCP) for a search warrant authorizing the examination of property currently in law enforcement possession that is more fully described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since January 2020. In September 2020, I was assigned to the FBI Albany Field Office's Capital District Safe Streets Gang Task Force, which is a task force that investigates, among other crimes, violent crime, gang activity, and drug trafficking, and is comprised of federal, state, and local law enforcement.

3.     During my time as a Special Agent, I have participated in investigations involving violent crime, drug trafficking, and organized crime.  In addition, I have worked with other FBI agents and law enforcement officers of varying experience levels, who have also investigated violent crime, drug trafficking networks, and organized crime, including criminal activity

engaged in by neighborhood-based gangs. As a result of my experience, I am familiar with how gang members possess and use firearms in furtherance of gang-related activity, including in violent encounters with rival gangs. I am also familiar with how gang members maintain a ready supply of firearms, which are made available to members of the gang when needed. Further, I am familiar with the manufacture and distribution of narcotics, communications between narcotics traffickers, and the use of cellular phones by gang members and narcotics traffickers to further their drug trafficking and other unlawful activities.

4.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to execute search warrants for, offenses enumerated in Title 18 of the United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## <u>IDENTIFICATION OF THE DEVICES TO BE EXAMINED</u>

6.      The device to be searched (**Target Device**) is a green Apple iPhone in a black case. As described below, the **Target Device** was seized on February 18, 2025, pursuant to a traffic stop and subsequent arrest of Williams conducted by the New York State Police. The

traffic stop and arrest were carried out by the New York State Police.  According to Pretrial

Services, the number that Williams used on this cellphone is (510) 929-6132.

7.      After the seizure of the **Target Device**, and in anticipation of this warrant

application, the FBI has been holding the **Target Device** at its Albany Field Office on 200

McCarty Avenue, Albany, NY 12209.  Based on my training and experience, I know that the

**Target Device** is being stored and maintained in a manner to preserve its contents at the time of

its seizure.  The **Target Device** is being kept in "airplane" mode in a "Faraday bag," which is a

container that blocks electromagnetic signals and thus prevents the **Target Device** from

accessing the internet or being interfered with remotely.  Williams voluntarily gave the FBI the

passcode to the **Target Device** at the time of his arrest, allowing the FBI to access it.

8.      The warrant being applied for would authorize the forensic examination of the

**Target Device** for the purpose of identifying and seizing electronically stored data that would

constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1)

(distribution and possession with intent to distribute controlled substances); 18 U.S.C. § 924(c)

(possession of firearm during and in relation to a crime of violence or drug trafficking offense);

and 18 U.S.C. § 922(g) (unlawful possession of a firearm) (collectively, the Subject Offenses)

committed by Williams, as more particularly described in Attachment B.

## DRUG TRAFFICKERS, GANG MEMBERS AND CELLULAR PHONES

9.      Based upon my training and experience, I know drug traffickers frequently

maintain on their cellular telephones telephone and address listings of clients and suppliers and

communications with clients, suppliers, and coconspirators.  For example, many drug traffickers

maintain cellular telephones that they use to coordinate their drug trafficking; specifically, they

use the cellular telephones to communicate with: (1) suppliers about obtaining additional

3

quantities of drugs and negotiate price and logistics related to acquiring those drugs; (2) customers about available inventory, prices, and logistics related to selling the drugs; and (3) co-conspirators about acquiring, storing, and transporting drugs and proceeds generated from the sale of illegal drugs, as well as to discuss obtaining or possessing firearms to protect their drug trafficking activities.  I also know based on my training and experience, that individuals involved in drug trafficking will (1) use cellular telephones and electronic devices to take and store photos and videos with associates and co-conspirators, and of items related to their drug business, including money, drugs, and firearms; (2) maintain notes and ledgers about transactions, prices, and money owed; (3) conduct financial transactions and make payments related to drug trafficking using their cellphones; (4) conduct searches for locations where drug business is conducted and use location-based services to travel to and from drug transactions; and (5) use third party applications, including social media applications, to share photos, videos, and written postings about their illicit activities and to show off wealth accumulated as a result of such activities.  Drug traffickers often use multiple applications on their cellular devices for this, including iMessage, WhatsApp, Facebook Messenger, Instagram, and Snapchat.

10.     Based upon my training and experience, I know that gang members often use cellular telephones to store, possess, and communicate information related to their gang activity. Members of street gangs often take and store pictures of their gang related activity and post them to social media sites as a way to promote the gang and its activities.

11.     Drug traffickers and gang members who possess firearms frequently maintain evidence of their ownership, possession, and use of those firearms on their cellular phones.  Such information can include photographs or videos of the owner with the firearm and communications about the firearm and its purchase, distribution, or use.

4

12.     Drug traffickers and gang members also frequently maintain financial records evidencing their criminal activity on their cellular phones.  Such information can include banking applications, such as Paypal, Venmo, or CashApp, as well as internet banking records and traditional financial records and applications.  Examination of such information can provide evidence of the placement, movement, and expenditure of proceeds of criminal activity, as well as the purchase of firearms, narcotics, and other contraband used in furtherance of drug and gang activity.

13.     Drug traffickers and gang members frequently carry their cellular devices with them or keep them in their vehicles.  Accordingly, cellular phones equipped with GPS location monitoring will often contain evidence of the user's location at the times of criminal or gang-related activity and also lead to evidence of the location of stash houses, gang hangouts, and the residences and locations where gang members and coconspirators congregate.

14.     Based on my training and experience, I know that individuals, including drug traffickers and gang members, can use cloud-based services (such as Apple iCloud and Google Drive) to sync accounts across multiple devices such that information created on one device can be accessed on other devices (e.g., photos, videos, contacts, calendars, and text message threads or chat conversations can be synced across, and available on, multiple cellphones, tablets, and laptop computers).

## **PROBABLE CAUSE**

### I.     **September 4, 2023 arrest of Williams**

15.     On September 4, 2023, about 6:58 p.m., Officer Crystallee Quell of the Albany Police Department observed Williams entering a silver Mercedes SUV with a New York license plate JCZ 7372 about Clinton Avenue and Lexington Avenue in or near the West Hill

neighborhood of Albany.  The Mercedes, which was owned by Keeler Honda in Latham, had been reported stolen, as Williams had retained it beyond the rental period and Keeler had been unable to contact him.  (Keeler also reported that the GPS tracker on the vehicle had been removed.)  Officer Quell conducted a traffic stop of Williams and the Mercedes shortly thereafter at or near 306 Orange Street, Albany.

16.     In the course of the traffic stop, Officer Quell verified that the vehicle was listed as stolen and conducted an inventory search of the vehicle in advance of impounding it.  In the inventory search, Officer Quell found approximately 25 grams of cocaine, drug paraphernalia including a scale, spoon and plastic bags, and a Glock 27 .40 caliber handgun, serial number SCE056, with fourteen rounds in the magazine.

17.     During the traffic stop, Williams made a phone call to a person who was apparently his younger brother, and the younger brother then walked to the location of the stop. Williams was then permitted to give his phone to his brother.  Based on my review of the body camera footage, the phone that he gave to his brother appears to be an Apple iPhone in a beige case.

18.     Following the discovery of a firearm and narcotics in his vehicle, Williams was arrested and taken to Albany Police Department, South Station, at 126 Arch Street in Albany, where he was given *Miranda* warnings and interviewed.  In the interview, Williams admitted to possessing the firearm.  Williams also admitted that he was a felon and further stated that he knew he was not allowed to possess a firearm.  Williams was subsequently charged with various state crimes, including Criminal Possession of a Controlled Substance in the 3rd Degree (Intent to Sell) and Criminal Possession of a Weapon in the 3rd Degree (Previous Conviction).

19.     In the arrest papers completed by the Albany Police Department, Williams's nickname was given as "Black."  Based on information provided by a confidential informant (CI), Williams is believed to have, or have had, ties to the Albany Uptown gang.[1]

20.     According to records provided by Keeler, on September 14, 2023, Williams entered into an agreement with Keeler to pay off the remaining balance on the rental agreement of $1437.00 by paying $125 to Keeler every two weeks.  Around November 2023, Williams informed Keeler that he would no longer pay off the outstanding balance.  Williams has a current balance owing to Keeler of $1147.00.  Between September 2023 and November 2023, according to the records provided by Keeler, Williams communicated with Keeler using the (510) 929-6132 number.  Williams left messages with Keeler in April and May 2024 using the (510) 929-6132 number.

## II.     Indictment and arrest warrant

21.     An indictment containing the charges against him was returned on February 20, 2024.  The case was dismissed in April 2024, apparently because the State's time to prosecute the case had expired.  It was then transferred to the United States Attorney's Office.

22.     On February 13, 2025, a federal grand jury returned an indictment charging Williams with three offenses.  These were:

a.  Possession of a controlled substance with intent to distribute (21 U.S.C. § 841(a)(1)

---

[1] The CI is cooperating with the government in an ongoing investigation involving the Uptown gang, and the government has informed the CI that it will seek leniency at sentencing in return for the CI's cooperation.

b. Possession of a firearm in furtherance of a drug trafficking crime (18 U.S.C.

§ 924(c)(1)(A))

c. Possession of a firearm by a prohibited person (18 U.S.C. § 922(g)(1))

23. Also on February 13, 2025, United States Magistrate Judge Paul J. Evangelista signed a warrant for Williams's arrest.

### III.    February 18, 2025 stop and arrest

24. On February 18, 2025, about 9.10 p.m., Trooper Daniel Storer of the New York State Police observed a white Dodge Charger with Georgia plates, registration CIF 1708, driving erratically and dangerously on the New York State Thruway (I-87) near Rosendale, New York. The Charger was driving too fast, veering between the right and left lanes and travelling too close to the cars in front. Trooper Storer, who was in a marked police car, pulled Williams over on the shoulder and requested his license. Williams informed Trooper Storer that he was travelling to an address in Cohoes, New York, which was the home address listed on his license.

25. When he was running Williams's license, Trooper Storer saw that this Court had issued a warrant for Williams's arrest. Trooper Storer asked Williams for his social security number to confirm that he was the person sought in the warrant, and Williams provided it. After Trooper Storer had confirmed Williams's identity, he arrested him and contacted the FBI.

26. Trooper Storer also conducted a search incident to arrest of Williams's person and an inventory search of the car. Trooper Storer found a total of $9,190.90 in cash, of which approximately $1,000 was on Williams's person and the remainder was in the center console of the car, wrapped in bundles. Trooper Storer also found a green iPhone with a black case (the **Target Device**). Trooper Storer seized the cash and the **Target Device** incident to Williams's arrest.

8

27.     I was informed that the State Police had arrested Williams and met Trooper Storer at the State Police barracks in Coxsackie, New York.  At the barracks, Trooper Storer transferred to me the cash he had found in his searches and the **Target Device**.  The **Target Device** is currently held at the FBI Albany Field Office as described above.

28.     Williams has been charged with four violations of the New York Vehicle & Traffic Law in connection with his stop on February 18.  These are VTL § 1128(a), unsafe lane change; VTL § 1128(d), crossing road hazard markings; VTL § 1129(a), following too close; and VTL § 1180(a), driving at a speed that is not reasonable and prudent.

**IV.     The phone**

29.     Williams has used the phone number (510) 929-6132 from September 2023, when he was first stopped and arrested in connection with the Subject Offenses, until the present. Williams used this number to communicate with Keeler Honda between September and November 2023, and then again in April and May 2024.

30.     Subpoena returns received from Williams's telephone provider, T-Mobile, on February 12, 2025 show that the number (510) 969-6132 was in use in the period between January 1, 2025 and February 10, 2025, with the registered subscriber as Devere K. Williams.

31.     Additionally, Williams reported that the number currently used with the **Target Device** is (510) 969-6132 in his interview with Pretrial Services on February 20, 2025.

32.     Based on the above information, and my training and experience, I believe that Williams has used the phone number (510) 969-6132 from September 2023, the date of the Subject Offenses, to the present.

33.     As noted above, based on body camera footage, it appears that Williams was using an Apple iPhone in September 2023.  Based on my training and experience, I know that

users of Apple iPhones can easily transfer much, or all, of the information that is stored on one iPhone to another, and that such a transfer may take place when the user wishes to obtain a new phone but continue using the same phone number. Therefore, even if the **Target Device** is not the same iPhone that Williams owned in September 2023, I believe that a search of the **Target Device** may reveal information concerning the Subject Offenses.

34.     Also as noted above, approximately $9,190.90 in cash was found on Williams at the time of his arrest. The officers asked him why he was travelling with a large quantity in cash, and Williams replied that he had planned to go shopping, but it got too late. The following conversation ensued:

| | |
|---|---|
| Officer: | What do you do for work now Devere? |
| Williams: | Huh? |
| Officer: | What do you do for work now? |
| Williams: | Pepsi. |
| Officer: | Oh right, I already asked you that. Pepsi be paying good, huh? |
| Williams: | They do. I stream also. |
| Officer: | You what? |
| Williams: | I stream. |
| Officer: | Stream? Like, video games? |
| Williams: | Yeah [inaudible] I play 2K, I play Madden. |
| Officer: | You got a good following? |
| Williams: | Yeah. |

35.     In his interview with Pretrial Services, Williams admitted that he had not worked at Pepsi since 2023. Williams also stated that his earnings from streaming were very low, giving as an example the $20 he supposedly earned on Valentine's Day. Williams estimated his income at around $2,800 per month, which derived from transporting family members and acquaintances and streaming. The only assets Williams identified to Pretrial Services were a bank account with

$400 in it and a vehicle, which he informed Pretrial Services had been involved in a car accident and which he was waiting to be paid out for. In Williams's bail hearing on February 21, 2025, Williams's counsel stated that he had recently received funds from a friend or acquaintance from the sale his vehicle.

36.     Based on the above information, and my training and experience, I believe that Williams may have been attempting to lead the police officers who stopped him on February 18, 2025, to believe that the money found in his car was earned legitimately, even though his answers to the police officers about his employment were not correct. I am also aware that Williams informed the officers who stopped him on February 18 that he was travelling to an address in Cohoes, which was listed as his residential address on his driving license, even though he informed Pretrial Services that his current address is in Schenectady, New York.

37.     I believe that further investigation may show that, between September 2023 and the present, Williams has continued to engage in illicit activities, and that the money recovered from Williams's car may have been obtained, in whole or in part, through illicit activities. I believe that an examination of the **Target Device** may reveal information about these suspected illicit activities.

## TECHNICAL TERMS

38.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Cellular telephone:  A cellular telephone (or mobile telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "land line"

11

telephones.  A cellular telephone usually contains a call log, which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, cellular telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic address books; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Cellular telephones may also include global positioning system (GPS) technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player:  A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media

12

include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.  Portable media players may include MP3 players and iPods.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System consists of various satellites orbiting the Earth, each of which contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data

13

and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

39.     Based on my training, experience, and research, I know that the **Target Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC DEVICES, STORAGE, AND FORENSIC ANALYSIS

40.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

41.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how a device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on forensic images of electronic devices because:

14

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the forensic examination of the forensic

15

image of the **Target Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the image to human inspection in order to determine whether it is evidence described by the warrant.

43.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises or seizure of tangible property. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## AUTHORIZATION REQUEST

44.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Device** described in Attachment A to seek the items described in Attachment B.

45.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

46.     Because this warrant seeks only permission to examine information already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Attested to by the affiant,

Patrick M. Lydon
FBI Special Agent

16

I hereby acknowledge that this affidavit was attested by the affiant by telephone on February 26, 2025 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

_____
Hon. Paul J. Evangelista
United States Magistrate Judge

## **ATTACHMENT A**

## Property To Be Searched

The property to be searched consists of the following cellular telephone located at FBI Albany Field Office, 200 McCarty Avenue, Albany:

     1.     a green Apple iPhone in a black case (referred to as the **Target Device**).

This warrant authorizes the continued seizure of the **Target Device** and its forensic examination for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Items To Be Seized & Searched

All records and information from the **Target Device** described in Attachment A that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances), 18 U.S.C. § 924(c) (possession of firearm during and in relation to a crime of violence or drug trafficking offense), and 18 U.S.C. § 922(g) (unlawful possession of a firearm) (collectively, the Subject Offenses) committed by Williams, and others known and unknown, including:

1. Any and all communications, photographs, videos, or other information relating to distribution or possession with intent to distribute controlled substances.

2. Any and all communications, photographs, videos, or other information relating to the acquisition, possession, or distribution of firearms.

3. Any and all address books, names, and lists of names and addresses of persons engaged in drug trafficking, illicit use of narcotics, unlawful possession of firearms, or gang activity.

4. Any and all communications, photographs, videos or other information evidencing membership in gangs, including the Uptown gang and any of its subsets.

5. Financial records, including cash, applications, and bank or financial records evidencing the movement, placement, depositing, withdrawal, or expenditure of money and the source of any funds identified.

6. Location data and other information sufficient to establish the location of the **Target Device** at the times of criminal activity, or the location of stash houses, gang hangouts, and residences of the user of the **Target Device** or other persons participating in illegal activity.

7. Records related to the purchase of personal assets, including but not limited to real estate, vehicles, and jewelry.

8. Records related to foreign or domestic travel to include but not limited to passports, documentation of travel destinations and time periods, and any and all records of expenses related to travel.

9. Evidence of user attribution showing who used or owned the **Target Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

10. Evidence of software that would allow others to control the **Target Device**, such as viruses and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software, and evidence of the absence of such malicious software.

11. Evidence indicating how and when the **Target Device** was accessed or used to determine the chronological context of the access, use, and events relating to crimes under investigation and to the user, including concerning the user's state of mind as it relates to the Subject Offenses.

12. Passwords, encryption keys, and other access devices that may be necessary to access any electronic media or accounts.

13. Records of or information about Internet Protocol addresses used by the **Target Device**, as well as records of or information about the **Target Device**'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

14. Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2